# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

KELLIE WALKER, et al.,

       Plaintiffs,

v.                                        Civil Action 2:17-cv-1037
                                         Judge George C. Smith
                                         Magistrate Judge Kimberly A. Jolson

VERNON P. STANFORTH, et al.,

       Defendants.

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Quash Subpoenas Duces Tecum Issued By Plaintiff (Doc. 15). For the following reasons, the Motion is **GRANTED**.

## I. BACKGROUND

Following her arrest in April 2016, Tiara Lin Adams ("Adams") was booked into the Fayette County Jail (the "Jail"). On June 13, 2016, while still a pre-trial detainee at the Jail, Adams passed away following a drug overdose. Plaintiff Kellie Walker is the mother of Adams and the Administratrix of Adams' estate. (Doc. 1, ¶ 6). She and Plaintiff Thomas Walker are the legal guardians of Adams' daughter, I.G.S. (*Id.*, ¶ 7). Defendants are Fayette County, Ohio and a number of employees of the Fayette County Sheriff's Office, including Vernon P. Stanforth ("Stanforth"), the Sheriff of Fayette County; Matthew T. Weidman ("Weidman"), the Fayette County Jail Commander; Cameron Hines ("Hines"), a Fayette County Jail Correctional Officer; and Jordan Riley ("Riley"), a Fayette County Jail Correctional Officer. (*Id.*, ¶¶ 8–12).

### A. Initial Overdose and Investigation

The circumstances surrounding Adam's fatal overdose and Defendants' alleged failure to prevent that overdose are the subject of the instant action. On April 15, 2016, Adams was

booked into the Jail as a pre-trial detainee and placed in general population. (*Id.*, ¶¶ 40, 49). Adams' mental health deteriorated over the next month, and she was unable to make bail following her June 3, 2016 indictment. (*Id.*, ¶¶ 52–54, 58–59).

In early June 2016, Adams was housed with a number of female prisoners in Unit 340A. (*Id.*, ¶ 60). On June 8, 2016, Meesha Pettiford ("Pettiford"), was arrested and booked into the Jail on a charge of drug possession. (*Id.*, ¶ 62). Correctional officers searched Pettiford upon her entry into the Jail and found no contraband. (*Id.*, ¶ 64). Although a canine unit alerted to Pettiford's groin area at the time of her arrest, the correctional officers did not conduct a body cavity search. (*Id.*, ¶¶ 63, 65). After booking, Pettiford was housed in Unit 340A with Adams. (*Id.*, ¶ 66).

Pettiford allegedly informed the other prisoners in Unit 340A that she had drugs and drug paraphernalia concealed in her vagina, which Adams and other prisoners helped remove. (*Id.*, ¶¶ 67–70). A prisoner subsequently informed a number of correctional officers that Pettiford had brought drugs into the housing unit and that a number of prisoners, including Adams, had used those drugs. (*Id.*, ¶¶ 76–82). Adams subsequently overdosed, which correctional officers and first responders treated with Naloxone. (*Id.*, ¶¶ 88–97). After being revived, Adams was transported to Fayette County Memorial Hospital for treatment. (*Id.*, ¶ 98). She was discharged from the hospital later that night. (*Id.*, ¶ 99).

The Jail initiated an investigation of Adams' overdose. (*Id.*, ¶ 102). Adams allegedly informed correctional officers that Pettiford was the source of the drugs that she used. (*Id.*, ¶ 104). Pettiford and another inmate, Brooker Merritt, were removed from Unit 340A to a booking cell, and a canine unit conducted a search of the Jail, alerting to the area around Pettiford. (*Id.*, ¶¶ 106–13). Correctional officers did not conduct a body cavity search of

2

Pettiford after the canine unit alerted. (*Id.*, ¶ 114). The canine unit did not detect the presence of narcotics on any other prisoners in Unit 340A. (*Id.*, ¶¶ 116–17).

While in the booking cell, Pettiford informed correctional staff that she still had drugs concealed in her vagina. (*Id.*, ¶ 128). Pettiford voluntarily removed two baggies from her vagina and informed correctional staff that there were no other objects inside of her. (*Id.*, ¶¶ 130–31). No correctional officers performed a body cavity search to confirm that Pettiford had no additional drugs or paraphernalia. (*Id.*, ¶ 132). Shortly thereafter, Pettiford reported that she had found another bag of drugs, which she provided to a correctional officer. (*Id.*, ¶¶ 133–134). Again, correctional officers did not perform a body cavity search to confirm that Pettiford had no additional drugs or paraphernalia. (*Id.*, ¶ 135).

On June 9, 2016, correctional officers interviewed Pettiford about her possession of drugs inside the Jail. (*Id.*, ¶ 137). Pettiford promised that she did not have any other drugs on her person. (*Id.*, ¶ 140). Correctional staff performed no further searches or tests to confirm that Pettiford did not have any drugs on her person. (*Id.*, ¶ 141).

**B. Second Overdose**

Upon Adams returning to the Jail on June 8, 2016, correctional staff placed her in the booking cell with Pettiford and Merritt. (*Id.*, ¶¶ 143–144). Despite her prior promise, Pettiford had allegedly retained drugs on her person or hidden them somewhere in the booking cell. (*Id.*, ¶ 155). Adams allegedly used those drugs. (*Id.*, ¶ 157). By mid-afternoon on June 9, Pettiford and Merritt were removed from the booking cell. (*Id.*, ¶¶ 153–154). Later that afternoon around 5:00 PM, Adams complained of feeling sick. (*Id.*, ¶ 157).

Defendant Hines was on duty from 11:00 PM on June 9 to 7:00 AM on June 10. (*Id.*, ¶ 165). Early in Defendant Hines' shift, Adams appeared to be "fine" and talked with Defendant

Riley and him. (*Id.*). Defendant Riley was on duty for the same time period and confirmed Defendant Hines' account. (*Id.*, ¶ 166).

Adams' behavior changed around 3:00 AM on June 10. (*Id.*, ¶¶ 167–69). According to Defendants Hines and Riley, Adams appeared as if she was under the influence of drugs and demonstrated signs of paranoia. (*Id.*, ¶¶ 168–69). Defendant Riley texted his shift supervisor regarding Adams' condition and contacted Scioto Paint Valley Mental Health Center to advise its staff of the situation. (*Id.*, ¶¶ 170–71).

Around 5:00–5:30 AM, Adams appeared to go to sleep. (*Id.*, ¶ 177). Correctional officers did not realize that Adams was unconscious when she failed to wake up for breakfast shortly before 7:00 AM. (*Id.*, ¶¶ 179–83). Defendant Weidman was called to the Jail's booking area around 1:00 PM. (*Id.*, ¶ 183). Around that same time, EMS was called to the Jail. (*Id.*). Adams was transported to the Fayette County Memorial Hospital where she was admitted around 2:00 PM. (*Id.*, ¶ 190). Adams suffered a full cardiac arrest due to opiate overdose. (*Id.*, ¶ 191).

Later that day, Adams was transported to Ohio State University Hospital for further treatment. (*Id.*, ¶¶ 192–94). Several days later, on June 13, 2016, Adams passed away due to acute intoxication by the combined effect of cocaine and fentanyl. (*Id.*, ¶¶ 195–96).

**C. Investigation and Criminal Prosecution of Pettiford**

Jon Fausnaugh, a detective with the Fayette County Sheriff's Office, and other law enforcement officers investigated Adams' overdoses and death. Before a grand jury, Fausnaugh testified that, among other things, Pettiford either "[g]ave" Adams the drugs that caused her death or "left" the drugs in the cell that Adams ultimately used, causing her death. (Doc. 16-1 at 58:17–59:3). Fausnaugh was the only witness to testify at the grand jury proceeding. (*Id.* at 68:14–69:2).

4

On May 5, 2017, Pettiford was indicted on charges of involuntary manslaughter; corrupting another with drugs; illegal conveyance of drugs of abuse into a detention center; possession of drugs - cocaine; and possession of drugs - fentanyl. (Doc. 27-6). On October 3, 2017, Pettiford pled guilty to illegal conveyance of drugs of abuse into a detention center and corrupting another with drugs and was sentenced to a four-and-a-half-year prison term. (*Id.*, ¶ 201).

**D. The Complaint and Instant Motion**

Plaintiffs filed the Complaint (Doc. 1) on November 30, 2017. It sets forth their theory of the case:

> This case arises from the deliberate indifference, recklessness, and gross negligence of correctional officers at the Fayette County, Ohio Jail which foreseeably caused the death of Tiara Lin Adams ("Ms. Adams"), a pre-trial detainee in their custody, from the combined effects of cocaine and fentanyl when, despite knowing that she had received illegal drugs smuggled in by another prisoner, had suffered an overdose from those drugs that required emergency hospitalization, and was struggling with opioid abuse and paranoid schizophrenia, for which she took prescribed medication, and based on their inadequate training and supervision by Fayette County and its Sheriff and the Jail Commander, they (1) placed her for hours upon return from her hospitalization in an open area beside the prisoner she had identified as her supplier and whom they believed to be her supplier, and (2) failed to monitor her continued use of drugs and emergent need for health care, in violation of her right to due process under the Fourteenth Amendment and their duty under the common law of the State of Ohio.

(Doc. 1, ¶ 1). Plaintiffs bring four claims against Defendants: (1) deprivation of due process under the Fourteenth Amendment, (2) wrongful death, (3) gross negligence, and (4) loss of consortium. (*See generally* Doc. 1).

In their First Set of Interrogatories and Requests for Documents to Defendants, Plaintiffs requested information regarding the grand jury proceedings that led to Pettiford's indictment. (Doc. 16-3 at 7–9). Defendants objected to the relevant interrogatories, (Doc. 16-4 at 2–3), and allegedly did not produce responsive documents, (Doc. 16 at 2–4).

On March 27, 2018, Plaintiffs served a subpoena duces tecum on Fayette County Common Pleas Court Judge Steven P. Beathard, requesting "any and all records and transcripts" from the Pettiford grand jury proceedings. (Doc. 15-1). On October 23, 2018, Defendants filed the instant Motion (Doc. 15). After the parties completed the initial briefing on Defendants' Motion, the Court issued an Order (Doc. 20) staying the case to give the parties the opportunity to meet and confer regarding the subpoena and related discovery issues.

"Plaintiffs subsequently filed a Petition in the Fayette County Common Pleas Court requesting disclosure of select grand jury material pertaining to Ms. Pettiford's indictment, based on a showing of particularized need." (Doc. 23 at 2). "On February 25, 2019, a hearing was conducted in the Fayette County Common Pleas Court[.]" (*Id.*). Plaintiffs' petition was denied, (Doc. 25-1), and the parties filed supplemental briefs (Docs. 27, 29, 31) concerning Defendants' Motion. The Motion is now ripe for resolution.

## II. STANDARD OF REVIEW

Rule 45 of the Federal Rules of Civil Procedure governs third-party subpoenas. Fed. R. Civ. P. 45. It permits parties in legal proceedings to command a non-party to, among other things, produce documents. Fed. R. Civ. P. 45(a)(1). Upon a timely motion to quash, a court "must quash or modify a subpoena" that "fails to allow a reasonable time to comply," "requires disclosure of privileged or other protected matter, if no exception or waiver applies," or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A). "The party seeking to quash a subpoena bears the ultimate burden of proof." *Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 253 (S.D. Ohio 2011) (citing *White Mule Co. v. ATC Leasing Co. LLC*, 2008 WL 2680273, at *4 (N.D. Ohio June 25, 2008)).

## III. DISCUSSION

Plaintiffs contend that the Pettiford grand jury materials are essential to their case. Under their theory, Pettiford was responsible for Adams' death, and Defendants were deliberately indifferent, reckless, or grossly negligent in addressing the risk of harm that Pettiford posed to Adams. Defendants, however, assert that Adams herself or other inmates were responsible for her death. In Plaintiffs' view, the Pettiford grand jury materials are necessary to prove their case and rebut Defendants' defense.

"[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979). "Rule 6(e) of the Federal Rules of Criminal Procedure codifies the traditional rule of grand jury secrecy." *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 425 (1983). It generally prohibits the disclosure of any "matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B).

Exceptions to that general rule are limited. A court can authorize the disclosure of grand jury materials "at a time, in a manner, and subject to any other conditions that it directs . . . preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E). The party requesting disclosure must demonstrate a "particularized need" for the relevant grand jury materials. *Sells Eng'g*, 463 U.S. at 443. To demonstrate a particularized need for grand jury materials, the moving party must show "that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil*, 441 U.S. at 222.

In an attempt to demonstrate a particularized need, Plaintiffs emphasize that Pettiford was indicted for, among other things, involuntary manslaughter related to Adams' death. They

maintain that Defendants must have presented some evidence to the grand jury to support the involuntarily manslaughter indictment. That evidence is particularly significant here, Plaintiffs argue, because Defendants did not indict any other inmates for Adams' death. Despite their best efforts in discovery, Plaintiffs assert that they have not been able to obtain a substitute for the information presented at the Pettiford grand jury. According to them, "[f]ailing to disclose this information, which is unavailable anywhere else, would be highly prejudicial to plaintiffs because the criminal culpability in Meesha Pettiford's case is the nexus to establishing civil liability in the current proceeding." (Doc. 27 at 11).

### A. Transcript of Fausnaugh's Grand Jury Testimony

Plaintiffs move for the disclosure of the transcript of Fausnaugh's grand jury testimony for two reasons. (Doc. 16 at 10). First, they argue that, in order to indict Pettiford for involuntary manslaughter in the death of Adams, Fausnaugh must have "made party admissions before the grand jury indicting Ms. Pettiford that it was her, not Ms. Adams, who brought th[e] drugs into the jail." (*Id.* at 4). Second, they contend that the transcript of Fausnaugh's grand jury testimony is necessary to refresh his recollection and for impeachment purposes. (*Id.* at 10–13). In their view, "[w]ithout disclosure of grand jury material containing information regarding the evidence presented to secure an indictment, which is unavailable elsewhere, Plaintiffs will suffer an injustice and will be severely hampered in proving that Ms. Pettiford was the supplier of the fatal drugs." (Doc. 27 at 8).

Plaintiffs have not demonstrated that disclosure of the transcript of Fausnaugh's testimony at the Pettiford grand jury is needed to avoid a possible injustice in this proceeding. They deposed Fausnaugh on November 5, 2018. (*See generally* Doc. 16-1). At his deposition, Fausnaugh testified regarding his investigation of Adams' death and his testimony before the

Pettiford grand jury. He discussed Adams' disclosure that Pettiford had provided the drugs responsible for her initial overdose. (*Id.* at 29:16–30:15). And he recounted testifying before the Pettiford grand jury that Pettiford was responsible for Adams' death:

> Q. Did you testify before the grand jury?
>
> A. Yes.
>
> . . .
>
> Q. In order to have an indictment handed down for involuntary manslaughter did you testify that you believed that [Pettiford] gave [Adams] additional drugs in the booking cell that caused her death?
>
> A. Gave or left. May have abandoned in the booking cell.

(*Id.* at 58:10–59:3).

In light of this deposition testimony, it is unclear to the Court what possible injustice disclosure of the transcript of Fausnaugh's grand jury testimony would avoid. At his deposition, Fausnaugh testified candidly regarding his testimony at the Pettiford grand jury proceeding and his conclusion that Pettiford was responsible for Adams' death. His testimony specifically addressed the issue of whether "Ms. Pettiford was the supplier of the fatal drugs," (Doc. 27 at 8). Plaintiffs have, therefore, obtained the key testimony they need through a source other than the grand jury transcript. *Cf. In re Grand Jury Proceedings*, 841 F.2d 1264, 1271 (6th Cir. 1988) ("The Supreme Court has said 'in weighing the need for disclosure, the court could take into account any alternative discovery tools available'" (quoting *Sells*, 463 U.S. at 445)).

To the extent Plaintiffs are frustrated by Fausnaugh's inability to identify specific evidence supporting his conclusion that Pettiford was responsible for Adams' death, Plaintiffs did not take advantage of the opportunity to explore that issue at Fausnaugh's deposition. Fausnaugh testified that he did not have any witnesses who observed Pettiford giving Adams the

drugs that caused her fatal overdose. (Doc. 16-1 at 58:2–9). Presumably, Fausnaugh concluded that Pettiford gave Adams the drugs causing her fatal overdose based on a series of inferences: Pettiford had smuggled drugs into the Jail; Adams and other inmates admitted that Adams initially overdosed on drugs provided by Pettiford; Pettiford admitted to having drugs on her person; while in the booking cell, Pettiford admitted to having additional drugs on her person; upon returning to the Jail after her initial overdose, Adams was placed in the booking cell with only Pettiford and Merritt; and Adams fatal overdose occurred in that cell in which she had no contact with inmates other than Pettiford and Merritt. Before the grand jury, Fausnaugh could have reasonably testified that this circumstantial evidence established probable cause to indict Pettiford for involuntary manslaughter for the death of Adams. But Plaintiffs did not explore this line of questioning at Fausnaugh's deposition. On these facts, disclosure is not appropriate.

Similarly unpersuasive is Plaintiffs' argument that disclosure of Fausnaugh's grand jury testimony is necessary to refresh his recollection and resolve inconsistencies between his deposition testimony and the sworn statements of other witnesses. (Doc. 16 at 10–13). The Supreme Court has recognized that "the typical showing of particularized need arises when a litigant seeks to use the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like." *Douglas Oil*, 441 U.S. at 222 n.12 (citation and internal quotations omitted). But when a litigant seeks to use grand jury transcripts for these purposes, courts have recognized a number of limiting principles, two of which are relevant here. First, grand jury materials may be disclosed to impeach a witness, to refresh his recollection or to test his credibility regarding "material issues." *In re Special Grand Jury 89-2*, 143 F.3d 565, 571 (10th Cir. 1998) (citing *In re Grand Jury Testimony*, 832 F.2d 60, 63–64 (5th Cir. 1987)). Disclosing grand jury materials to impeach a witness regarding nonmaterial issues would

undermine the secrecy that our grand jury system requires to function without any corresponding benefit. Second, as Plaintiffs recognize, (*see* Doc. 16 at 12), "speculation" that grand jury materials may allow a litigant to impeach a witness, to refresh his recollection, or to test his credibility "does not satisfy the 'particularized need' standard," *Stojetz v. Ishee*, No. 2:04-CV-263, 2014 WL 4775209, at *74 (S.D. Ohio Sept. 24, 2014), *aff'd*, 892 F.3d 175 (6th Cir. 2018). If courts permitted disclosure of grand jury materials based on speculation that they contained material that could be used for impeachment, to refresh a witness' recollection, or to test a witness' credibility, the protections offered by Federal Rule of Criminal Procedure 6(e) would have little meaning.

Plaintiffs contend that Fausnaugh's deposition testimony was inconsistent regarding what happened at the hospital after Adams' first overdose. (Doc. 16 at 10–11). Specifically, they allege that, at his deposition, Fausnaugh could not recall who relieved him from the hospital and who drove Adams back to the Jail from the hospital. (*Id.*). Those details are tangential, at best, to the material issues in this case. Further, Plaintiffs have offered nothing more than speculation that Fausnaugh may have testified about those tangential details before the Pettiford grand jury. Disclosure is, therefore, not justified based on these arguments. *See In re Special Grand Jury 89-2*, 143 F.3d at 571; *Stojetz*, 2014 WL 4775209, at *74.

Plaintiffs also argue that Fausnaugh's deposition testimony was inconsistent with the statements of other witnesses in this action. (Doc. 16 at 11–12). According to them, Fausnaugh previously told Adams' family members that Adams informed him that Pettiford had provided Adams with the drugs that caused her first overdose; but at deposition, Fausnaugh denied the same. (*Id.*). They, therefore, contend that they need Fausnaugh's grand jury testimony to test his credibility. (*Id.*). The fact of who gave Adams the drugs that caused her first overdose is a

11

material issue in this case. But whether Fausnaugh learned of Adams' admission from Adams herself or another individual is not. At his deposition, he testified that he listened to Adams' interview with another deputy during which she admitted that Pettiford had provided her with the drugs that caused her first overdose. (*See* Doc. 16-1 at 29:20–30:11). Moreover, Plaintiffs have offered only speculation that the grand jury materials might contain information regarding this issue. Disclosure is, therefore, not justified based on these arguments. *See In re Special Grand Jury 89-2*, 143 F.3d at 571; *Stojetz*, 2014 WL 4775209, at *74.

On the facts before the Court now, Plaintiffs have failed to demonstrate a particularized need for the transcript of Fausnaugh's grand jury testimony. The Court, therefore, declines to order its disclosure.

**B. Grand Jury Exhibits**

Plaintiffs also argue that disclosure of the exhibits presented to the Pettiford grand jury is necessary because "[t]he Grand Jury must have received information in some form that enabled jurors to connect the dots from the material provided in the investigations of Ms. Adams' overdoses and death to return a five-count indictment, particularly given the short length of Detective Fausnaugh's testimony." (Doc. 16 at 10). In their view, "[f]ailing to disclose this information, which is unavailable anywhere else, would be highly prejudicial to plaintiffs because the criminal culpability in Meesha Pettiford's case is the nexus to establishing civil liability in the current proceeding." (*Id.*).

The Sixth Circuit has articulated a clear standard for the disclosure of this type of information:

> Federal Rule of Criminal Procedure 6(e) creates an obligation of secrecy that prevents certain persons from disclosing a matter occurring before the grand jury. Confidential documentary information not otherwise public obtained by the grand jury by coercive means is presumed to be matters occurring before the

grand jury. Thus, even documents that were originally prepared in the ordinary course of business are presumptively matters occurring before the grand jury when they have been requested pursuant to a grand jury investigation.

Mere contact with a grand jury, however, does not change every document into a matter occurring before a grand jury within the meaning of Rule 6. Rather, a party can rebut the presumption that the sought-after materials should be so classified by demonstrating that the information is public or was not obtained through coercive means or that disclosure would be otherwise available by civil discovery and would not reveal the nature, scope, or direction of the grand jury inquiry.

*Dassault Systemes, SA v. Childress*, 663 F.3d 832, 845 (6th Cir. 2011) (citations, quotations and alterations omitted).

Plaintiffs do not address this standard and, therefore, have not made a showing that disclosure of the Pettiford grand jury exhibits is justified. As a practical matter, the parties should be able to resolve this matter without Court intervention. In response to Plaintiffs' discovery requests, Defendants have produced numerous documents related to Adams' death and Pettiford's indictment, including the prosecutor's complete file for the Pettiford grand jury. One could reasonably assume that any exhibits presented to the Pettiford grand jury would be included in the prosecutor's file. The parties should meet and confer on this issue to discuss (1) whether there are any documents that were presented to the Pettiford grand jury that have not been produced to Plaintiffs, and (2) if such documents exist, the grounds for Defendants withholding them from Plaintiffs. Depending on the results of the meet and confer process, the Court may be willing to consider granting Plaintiffs leave to serve a narrowed Rule 45 subpoena.

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' Motion to Quash Subpoenas Duces Tecum Issued By Plaintiff (Doc. 15) is **GRANTED**.

IT IS SO ORDERED.

Date: May 24, 2019                                     /s/ Kimberly A. Jolson
                                                      KIMBERLY A. JOLSON
                                                      UNITED STATES MAGISTRATE JUDGE